EUNICE STANTON *against* EBENEZER WILLSON and BENJAMIN SMITH, Executors of the last will and testament of JOHN BIRD, deceased.

EUNICE STANTON, Administratrix on the estate of JOSHUA STANTON, jun. deceased, *against* EBENEZER WILLSON and BENJAMIN SMITH, Executors, &c.

MOTION for a new trial.

These were actions of book debt for education and support, furnished by the plaintiff, before her intermarriage with *Stanton*, and by him afterwards, to the children of *Bird*. As both the cases depend upon the same principles, and were argued together, it is not necessary further to distinguish them.

The account produced at the trial consisted of the following articles:

To cash paid Mr. *Conklin* for his wife's nursing *William*, an infant son of said *John Bird*, from *June* 1st, 1797, to *April* 1st, 1798, 43 weeks and three days, at 1 dollar, - - - - $43 43

To paid for extra nursing in his sickness, - 5

To paid the doctor's bill for ditto, - 10

To clothing said *William* 10 months, - 20

Husband and wife were divorced by a decree of the legislature; alimony was allowed her, which was to be in lieu of all claims of dower; and she was constituted sole guardian of two of their infant children; held, that the father was liable for education and support of such children, furnished in the first place by her as guardian, and afterwards by a stranger, to whom she had been married.

Where an infant child elopes from his father for fear of personal violence and abuse, and cannot with safety live with him, the father is liable for necessary support and education furnished to such child by a stranger.

What articles are necessaries, must depend upon the circumstances of the party for whom they are furnished; and when those circumstances are ascertained, the court will only instruct the jury as to the *classes* of articles which are to be considered as necessaries.

Book debt will lie for necessaries furnished to an infant, without a request from the party liable, or a promise to pay for them.

A wife may be a witness for her husband in an action of book debt, especially after his death, though the charges accrued in his life-time.

To boarding, clothing and nursing said *William*
   from *March*, 1798, to *September*, 1803, 6 1-2
   years,    -    -    -    -    -    $429 00
To schooling said *William* 2 1-2 years at 6 dol-
   lars,    -    -    -    -    -    15 00
To nursing and clothing *William* and his sister
   *Maria*, from *June* 1st, 1797, to *May* 15th, 1798,
   49 weeks and 6 days,    -    -    -    74 78
To extra nursing and doctor's bill in her last
   sickness,    -    -    -    -    -    20 00
To boarding and clothing said *William* from
   *October*, 1803, to *February*, 1806, 117 weeks
   and 1 day, at two dollars 50 cents,    -    292 87
To two and a half years' schooling said *William*,    12 00
To boarding *John Herman Bird*, son of said *John
   Bird*, from *February*, 1805, to *February*, 1806,
   48 weeks and 1 day,    -    -    -    96 30
To paid for classic books, and tuition at college
   for the same,    -    -    -    -    55 00
To expense money furnished the same,    -    20 00

In the course of the trial, it appeared, that the plain-
tiff was married to *Bird* in *October*, 1789, and continued
to be his lawful wife, until *May*, 1797, when she was di-
vorced by a decree of the general assembly. By that
decree, she was constituted sole guardian of their
youngest children, *William* and *Maria*, mentioned in
the account, until they should respectively attain to the
age of twenty-one years, which guardianship she ac-
cepted. *Bird* was ordered to pay her, within six
months from the 1st of *June*, 1797, three thousand
dollars, as her part and portion of his estate, and in
lieu of all claims of dower. This sum was afterwards
paid to her satisfaction; and she gave him a written dis-
charge from all claims and demands which she had
against him, by virtue of the decree. *William* and
*Maria* lived with, and under the care of the plaintiff;

and their support and education charged in the account
were furnished by her, until her intermarriage with
*Stanton*, in *October*, 1803, and by him afterwards. Of
*John Herman*, the elder son of *Bird* and the plaintiff,
she was not appointed guardian. He continued with
his father several years after the divorce, and then, as
the plaintiff contended, and introduced some evidence
to prove, eloped from him for fear of personal violence,
and went to live with *Stanton*. After this, *Stanton* fur-
nished him with the support, tuition, books and money
charged in the account. It was agreed, that the whole
of the charges accrued without any request from *Bird*,
and that he had never made any express promise to
pay them.

The plaintiff offered herself as a witness in support
of the charges. She was objected to, as incompetent
to testify as to such as accrued after her intermarriage
with *Stanton*, on the ground of her relation to him.
this objection was overruled; and she was admitted.

On the merits, the defendants contended, that *Bird*
was not liable to pay *Stanton* for any part of the account
for supporting *William* and *Maria*, on the ground that
*Stanton* was not their guardian; and that, if there was
any liability, it accrued to *Stanton* and his wife jointly.
But the court decided, and gave it in charge to the
jury, that the sole guardianship of the mother was no
objection to a recovery by *Stanton*, inasmuch as the debt
accrued solely to him.

The defendants also contended, that the plaintiff
could not recover for any part of the charges relating
to *John Herman;* but the court decided, and gave it in
charge to the jury, that if they found that he eloped
from his father for fear of personal violence and abuse,
and could not with safety live with him, the plaintiff

was entitled to recover such sum for his support and education as they should judge reasonable.

The defendants further contended, that upon the facts stated, the action of *book debt* would not lie; but the court decided, and gave it in charge to the jury, that the action of book debt was the proper remedy.

The defendants further contended, that by force of the decree of the general assembly, and the discharge of the plaintiff, *Bird* was not bound by law to support the children; but the court decided, and gave it in charge to the jury, that he was solely liable for their support.

On the whole case, the court directed the jury to find for the plaintiff to recover of the defendants such part of the account as was just and reasonable, taking into their consideration the situation and circumstances of the respective parties.

The jury found for the plaintiff accordingly; and the defendants moved for a new trial, on the ground that the court mistook the law in admitting the testimony objected to, and in their charge to the jury.

*N. Smith* and *Beers*, in support of the motion.

I. One point contended for by the defendants in the superior court, and reserved for the opinion of this court, is, " *that by force of this decree, John Bird was not by law bound to support the two youngest minor children, viz. William and Maria*, for whom the principal part of the support was furnished."

By the decree, recited in the record before us, the rights and powers of the father as guardian are taken away, and placed in the hands of the *mother*.

1st. We contend, in the first place, that the *duty* to support ceases, when all the rights and powers of the guardian by nature are taken away from him, and placed in the hands of a person who, before this, was equally bound to support with him.

By the law of *nature*, each of the parents is equally bound to support and educate their offspring. The general expression "*parent*," is always used by legal writers, when treating of this natural liability to support children; they do not restrict it to the *father*, or *mother*, alone. 1 *Bl. Com.* 447.

To be sure, *during the coverture*, by the laws of many countries, the husband and wife are deemed but one person in law. She having no separate rights, and he having the exclusive control and custody of all their property, she can rarely be seen, or known, on this subject of support; but the instant the coverture ceases, she again shows herself;—her liability again appears. and even *during the coverture*, if you can find her with separate property, she has been held bound to contribute. It has been decided in *Great Britain*, that where the wife has separate property, and it goes to the husband's use during the coverture, she may come in as a creditor against his estate to that amount. 2 *Atk.* 284.

So where *her* real estate is mortgaged for his debts, *his* estate shall redeem it after his death. But it has been decided, that her contributions of separate property to the *maintenance of the family*, do not render her a creditor to his estate. So in case of *natural born children*, as the father and mother of them have separate rights, and separate property from each other, they are, by the laws of most countries, equally bound to contribute for their support, where the father is ascertained and known. And in *all* cases where you can find the father and

Vol. III.   G

mother standing in *this situation*, they are *equally* bound to maintain their offspring. Thus stands the case when the guardianship remains in the ordinary hands.

But the case before us, is one, where the father, by a legislative act, is totally prohibited the care, custody and guardianship of his children; not only *that*, but the mother is by this same act constituted and appointed the sole and exclusive guardian till the children attain the age of 21. The same act which has sealed his existence as a husband, has also closed his existence as a parent and natural guardian.

But let us suppose all that the gentlemen opposed to us can contend for; suppose that the father alone is *generally* bound to support after the coverture is determined by divorce. In these cases, he almost universally remains the guardian of his children. But in the case before the court, *he* has no control over them; *he* cannot direct in what manner they shall be supported; no economical mode of his devising or prescribing is to be regarded or followed. /Another person, *now* a stranger to him in legal contemplation, is to manage affairs in her own way, expend what she deems proper, and he must silently submit, and pay bills as presented. Surely the laws of *Connecticut* will not teach us such a doctrine.

2d. On a fair construction of this decree, all obligation to support, ceases on the part of *John Bird.* By this decree, this woman is not only *divorced*, and *appointed guardian* to the children, but she has the large and unexampled sum of 3,000 dollars given her out of his estate.

The mere act of giving her this large sum of money, if there was nothing else in the case, furnishes strong presumptive evidence enough that it was the *intention* of the legislature to give it for the support of the *children*, as well as for the support of the *woman*.

It is *not* given to her merely for *life*, as in ordinary cases; but it is given to her *absolutely*, for ever. Nor is it to be set off to her out of his *lands*, or in any *articles of personal property*, but it is ordered to be paid in *cash*.

Again: when the legislature had their hands in the pockets of *John Bird*, making provision for this unfortunate woman, can we, for a moment, suppose that they would have been so inattentive and negligent towards these novel sort of orphans, as to have made no provision for them? Did the legislature forget that they had, at that instant, decreed, that this woman should be the future guardian of these children;—should have the sole and exclusive custody and control of them? Could they reflect upon this a moment, without perceiving the necessity of making provision to enable her to discharge the duties thus imposed upon her, in a proper manner? Did they mean *she* should eat bread before them, and give them none?—No: they knew that they had thrown these children upon the hands of this woman; and hence it was, that they decreed this large sum of money to enable her to support *them*, as well as *herself*. Can we believe that they intended, that every time she furnished these children with a meal of victuals, or a garment, that she should pursue *John Bird* into a foreign state or country; there commence a suit against him; there collect her testimony at a much greater expense than she could ever recover; and thus go through a long course of litigation with him? And so on, repeating the same, from time to time, as often as supplies were furnished them? Never can we impute to a body of men, composed of the collected wisdom of the state, such an unreasonable and foolish intention as this.

Again: on the *face of the decree*, there is a declaration of the intention of the legislature. It is there de-

clared, in effect, that this 3,000 dollars shall be appropriated for the *nurture and education of the children,* as well as for the *support of the woman.* The decree is in these words, (viz.) " that the said *John Bird* shall, within 6 months from the 1st of *June,* 1799, pay to the said *Eunice* 3,000 dollars, as *her* part and portion of the estate of said *John,* AND *in lieu of all claims of dower."*

This, then, is given to her for two purposes:

1st. For " *her* part and portion of the estate of said *John;*" and,

2d. " In *lieu* of all claims of dower."

Under this last clause of the decree, it then becomes necessary to inquire what is meant by the term *dower;*—what it is ever given for;—what is the *object* of it.

Is dower given for the support of the *woman alone?* By no means: it is given for something more; it is for the *nurture and education of the children,* as well as for *her support.* And because the legislature have anticipated it, and ordered it to be paid before the *natural* death of *John Bird,* the application of it is not to be changed to a different purpose than that which the law has fixed. It is to be applied to the same use as though he was naturally dead, and it was set out to her as her *third* part of his estate.

Whatever may be the idea affixed to the term dower in *common parlance,* the true legal signification, as defined by the ablest common law writers, " is that portion of the husband's lands, which the wife has, after the husband's decease, for the sustenance of herself, AND *for the nurture and education of her children." Co. Litt.* 30. b. 2 *Bl. Com.* 129, 130. *Jacob's Dictionary,* tit. " *Dower."*

And this court will, at once, recognise it as a well settled rule, that where a technical term of the common law has acquired a fixed signification, and is used in an act of the legislature, such act is to receive the common law construction. 4 *Bac. Abr.* 647.

If, then, *dower* is given for the *nurture and education* of children, as well as for the support of the wife; and *this* is given in *lieu* of *that*, (though the *arrival* of it has been *hastened* by the interposition of the legislature,) it must, of course, follow, that this 3,000 dollars was intended for *their* support, as well as for that of the *woman.* And if it is about to be contended, (as it has heretofore,) that the man must have been *dead*, in order that the idea of dower can apply to the case, it may be answered, that by this sovereign act of the legislature, this man, in contemplation of law, was as effectually dead to all intents and purposes as it respected her, as though he had died a *natural* death. By this decree, *she* ceased to have any *husband; he* ceased to have any *wife.* Nay, *more* was effected by this decree than by a natural death of the husband: by a *natural* death, the children are left guardianless; but here, the same act which terminated his existence as a husband and a guardian, appointed another person guardian to his children. Much less than this kills a man in *England:* there, by a kind of civil suicide, a man may close his own existence, without the aid of a legislative decree. Abjuring the realm, or becoming a monk, terminates a man's existence as completely, for all civil purposes, as if he had died a *natural* death.

3d. *John Bird* cannot be liable, where it appears that the advancements were made *without his consent or request, and against his will.* It is very evident, from the whole course of proceedings, as far as the record will discover it, that every step from the application for a

divorce, down to the death of *John Bird*, was *against his will*: and it is stated in the record, that the advancements, which constitute her account, were without any promise or request from him.

It is a principle well settled in the country from whence we derive our ideas of jurisprudence, that if a wife elopes from her husband, (though not with an adulterer,) and supplies are furnished her *against his will*, no recovery can be had for them. 2 *Stra*. 875.

II. In the next place. *Can the plaintiff recover for any part of her account, which is for the support of John Herman Bird, who was not under her guardianship, but under that of his father?*

1st. Whatever might be her claim to a recovery for the *other parts* of her account, most clearly *no part* of *this class* of charges, can, on any principle, be supported.

It appears, that this child *eloped* from his father, and went to live with his *mother's husband*: and it is said, he had fears of personal violence. Whether these fears were well grounded or not, or whether, like all other boys, he did not deserve and expect correction at times, does not appear. But we apprehend, that the pretended, imaginary, or even *real*, fears of a boy, are to be no justification for his eloping. Much less are they sufficient to authorize any stranger (for such was *Joshua Stanton*) to harbour, provide for, and educate him, at the expense of the father. Otherwise, a father would be placed in a perilous situation;—he would never dare to exercise his parental authority, if upon every look of disapprobation, the child might run away to some stranger, pretend that " *he was afraid of personal violence*," and thus authorize the stranger to receive him, and charge the father. It would be constituting a child the

sole judge of the propriety of his father's actions and
conduct. It would totally prevent the father from
*training up his child in the way he should go.*

2d. If *any* part of these charges are recoverable, that part of them particularly which consists of moneys expended for " *books, tuition and spending money at college,*" to the amount of 75 dollars, cannot be recovered.

There is no common or statute law, in *Great Britain,* or the state of *Connecticut,* compelling *a man of property* to *educate* his children, and particularly at *college.* They are left by the laws, at their own option, whether they will breed up their children to be ornaments, or disgraces to their family. 1 *Bl. Com.* 450. 2 *Swift's System,* 205. In *England,* they have certain statutes for the apprenticing of *poor* children; but no law (says Judge BLACKSTONE) compelling rich men to educate their children. So in *Connecticut,* the law has left it to the consciences of parents; and has only made provision for a sufficient degree of learning to prevent their sinking into barbarity; and that is, by requiring that children learn to read the *English* tongue well, and to know the laws against capital offences. Undoubtedly, this young man had received this learning from his father, or we should not have found him in a college immediately after eloping. In *Vermont,* where this education was bestowed, they have no statute at all on this subject. Whatever, then, is the common law of *England,* is the law of that state, since their statute adopting the common law. That common law, we have seen, makes no provision on the subject.(*a*)

III. Another question reserved for the opinion of this court is this: *Will the action of book debt lie?*

(*a*) See *Chipman's Rep.* 111.

We contend, that it will *not*. We apprehend, that this action will never lie, where the liability arises by *mere operation of law*.

This is a case of money laid out and expended, by a stranger to *John Bird*, for the support and education of his children, contrary to his mind and will. No agreement, or request, on his part is pretended. If the action of book debt will lie for this kind of implied agreement, no reason can be shown why it will not lie on every possible kind of implied agreement. If it will lie in the present instance, you may charge on book money paid under a *mistake*, or money paid *through the deceit of another*, and recover it back in this form of action. So money paid on a *consideration which happens to fail;* money obtained under a *void authority;* by *extortion, imposition, oppression;* or money paid on a note and *not applied*, might all with equal propriety be charged on book, and recovered back in this action. But it having been so recently settled by this court, in the case of *Bradley* v. *Goodyear*, 1 *Day's Cas.* 104. that money paid on a note, and not applied, could not be charged on book, that it will not now be contended for.

We contend further, that *if John Bird was liable to support these children, the plaintiff ought to have preferred her petition to a county court, in conformity to the statute law of this state,(a) or of the state of Vermont, where the support was furnished.*

The law of nature which applies to this subject, has merely compelled certain relations to support each other, but has not pointed out the *mode* in which they shall be *compelled* to do it. Hence we find that in *Great Britain*, in *Connecticut* and in *Vermont*, (where this support was furnished,) the legislature have passed acts declaring

(a) Tit. 88. c. 1.

what that law of nature is, and pointing out a *mode* in which this law shall be enforced.(*a*)

In *Connecticut* and *Vermont* the acts are literal copies of each other in this respect; and the *manner* in which this obligation is to be performed is thus pointed out. The county court of the county where the relieved person dwells, on application by any relation, shall assess what shall be just and reasonable, and the sufficient liable relations shall pay in such manner and proportion as the court shall adjudge; and that whether such relations live in that county or not. This assessment *liquidates* the account. And it is also highly *proper* that it should be done there. The judges, who are to determine on the reasonableness of the account, live in the neighbourhood where it is furnished, and are therefore more competent to judge what is reasonable *there* than a court in the State of *Connecticut* or *New-York*. A sum which might be reasonable in one of these states might not be adjudged so in another.

But it has been said, and perhaps will be again, that these statutes do not extend to *infants* who are supported; but merely extend to persons who have *once* supported themselves and have *become* poor; of course can reach none but *adults*.

A few words from Judge *Blackstone's Commentaries* will set this point at rest. In the 1st vol. p. 449., he observes. that " no person is bound to provide a maintenance for his issue, unless where the children are impotent, either through *infancy*, disease or accident."

These are comments on the *English* statute of 43 of *Eliz.*; but it will be found, on comparing *our* statute with

(*a*) *Vide Kirby*, 156.

VOL. III.　　　　　　　　H

June, 1808.  theirs, that in this respect, they are expressed in similar
            terms.
STANTON
  v.
WILLSON.

IV. Another point is this. We contended in the
court below (and it was overruled) *that this plaintiff ought
not to be admitted to testify, to prove her account, because
when the account accrued she was the lawful wife of
Joshua Stanton,* jun.

It is not on the ground of an *interest* which she may
have, that we object to the admission of this plaintiff, for
in the action of book debt, *interest* is no objection to the
admissibility of a witness; for the parties *themselves* are
invariably admitted, and no persons can be more interested
than they are.(*a*) But it is on the ground of *policy* that we
object. If she can be admitted a witness *for* him, then she
may *against* him. If she is introduced *by* him to testify
in his favour, and on cross examination she discloses the
whole truth, and it proves *against* him, it will create the
most implacable quarrels and dissensions between them,
and break in and totally destroy all the happiness of the
married state. If she can be introduced by *him*, she may
by *others*, and thus all the secrets of the family might be
drawn out. And it makes no difference that she is not,
at the *time of testifying*, his wife : it is enough to exclude
her, that she came by this knowledge at a time when
she was his wife.

In *Great Britain*, the exact point which we are contend-
ing for, has been judicially decided, in a very recent
case, reported in the *Appendix* to *Peake's Evidence*, p. 44.
*Monroe* v. *Twisleton.* This is also laid down by Mr.
*Peake* a*s* the settled law, in p. 174. of the body of his
treatise; *though he himself* was opposed to the decision
at the time it was made.

(*a*) *Vide* stat. *Conn.* tit. 25. c. 1.

*Daggett* and *Gould*, contra.

I. The first question is, whether *Bird* was liable for the support of *William* and *Maria?*

The duty of the father to provide for the maintenance of his infant children is a principle of natural law, recognised and established by the common law. 1 *Bl. Comm.* 446. 448, 449.; 1 *Swift's Syst.* 204. In this case, support was furnished to such children; the articles furnished were necessary and proper; and they were furnished by a person appointed by law to do it in his stead. His liability, therefore, results conclusively, unless there are peculiar circumstances attending the case, which exonerate him. If he is exonerated at all, it must be by virtue of the decree of the general assembly. By that decree, *Bird* and the plaintiff were divorced *à vinculo matrimonii;* she was appointed the guardian of these children; and was allowed a reasonable sum as alimony from his estate.

Does the *divorce* discharge his liability? There can be no pretence of it. He is still the father of his children. The relation between them is not impaired, nor affected. Their respective rights and duties remain the same. It would be strange, indeed, if a *natural* duty from *A.* to *B.* should be discharged, by dissolving a civil relation between *A.* and *C.*

Does the *appointment of the mother as guardian* discharge his liability? As to this question, it makes no difference whether the guardian be the mother, or any other person. A guardian, as such, is not bound to support. He is the mere agent, trustee, and committee of the person and estate of his ward. 1 *Bl. Com.* 460.

June, 1808.

STANTON
v.
WILLSON.

In chancery, a guardian will be allowed to apply the property of the infant for his support. *Com. Dig.* tit. *Chancery*, 3 *O*. 2. And in this state, he may charge the articles furnished on book, and recover for them, in an action at law. *Mills* v. *St. John*, 2 *Root*, 188. But it is otherwise with regard to a *father*. He will not be allowed, even in chancery, to apply the property of his child to his support, except where the father is in distressed circumstances. *Darley* v. *Darley*, 3 *Atk.* 399. *Hughes* v. *Hughes*, 1 *Bro. Chan. Cas.* 387. *Roach* v. *Garvan*, 1 *Ves.* 160. *Com. Dig.* tit. *Chancery*, 3 *O*. 1.

The duty of the father to support his child arises from the relation between them. That relation subsists, notwithstanding the appointment of another person as guardian.

Does the *allowance of alimony* discharge his liability? Why should it? Because, it is said, it will be *presumed* to be for the support of children. But whence arises such a presumption? Is alimony never allowed where there are no children? or where, by the terms of the decree, they are to remain with the father? Suppose, in this case, the children had *died* immediately after the plaintiff had received her alimony; could she be compelled to refund it?

II. The next question is, whether *Bird* was liable for the advances made to *Herman?*

There is no pretence, but that *Bird* was bound to support this child, in some way or other. The objection proceeds on the ground, that the supplies furnished were not *necessaries;* and that the persons furnishing them had no right to furnish them, and charge them to him.

As to the first part of this objection, it is a sufficient
answer, that in determining *what are necessaries* the
situation and circumstances of the parties are to be
considered; and the direction of the court to the jury
was, *to allow such part of the account as was just and
reasonable, taking into consideration the situation and cir-
cumstances of the parties.*

As to the other part, we contend, that if the father
*turns* away his child; or, by cruelty, *drives* him away; or
permits him to be away; he sends a *credit* with him;
any one may relieve him on the father's account, espe-
cially a near connection.

If a *husband* turns his *wife* out of doors, he thereby
gives " *a tacit assent*" to her contracts for necessaries;
or, in other words, he sends with her credit for her rea-
sonable expenses. 1 *Pow. Contr.* 139. *Rawlyns* v.
*Vandyke,* 3 *Esp. Rep.* 251. where the husband of the
mother of an infant child had taken the child into his
family, and had then *left* him, it was ruled, that he was
liable for necessaries furnished to the child on her con-
tracts. *Stone* v. *Carr,* 3 *Esp. Rep.* 1. In *Rawlyns* v.
*Vandyke,* just cited, Lord *Eldon* held, that where the
father and mother are separated, and the husband *suf-
fers* the children to remain with their mother, he thereby
constitutes her his agent, and authorizes her to contract
for necessaries for them. In the principal case, *Bird*
did something more than merely *to leave* his son *Herman*
without making provision for his support; and some-
thing more than to *suffer him* to go and remain with
his mother. *Hodges* v. *Hodges,* 1 *Esp. Rep.* 441. is
perhaps still more strongly in point. In that case, Lord
*Kenyon* ruled, that where a wife's situation in her hus-
band's house was rendered unsafe from his cruelty, or
ill treatment, it was equivalent to turning her out of
doors, and he would be liable for necessaries furnished

June, 1808.

STANTON
v.
WILLSON.

to her under those circumstances. It is impossible to distinguish the case cited from the principal case as relative to *Herman*, except upon a supposition equally absurd and illegal, that a father is under less obligation to support his child than a husband is to support his wife.

III. The counsel for the defendants contend, that we have misconceived our action. They insist, that we should either have brought *indebitatus assumpsit*, or made an application to the county court under the statute.

The reason offered for bringing *assumpsit* is, that the liability arises by mere operation of law. But *book debt* also will lie in many cases, where the promise is an implied one. Indeed, the principal use of this action is to support a recovery in such cases. It is very seldom that it is brought where there is an express promise to pay; for a party will not be allowed to prove such a promise by his own oath. Guardians, conservators, &c. always make their charges on book; and are allowed to support them by their own oaths, and to recover for them in this action. *Mills* v. *St. John*, 2 *Root*, 188.

Again: If *A.* is *obliged* to pay the debt of *B.*, we admit that book debt lies not, but *indebitatus assumpsit*. There, as between *A.* and the *creditor*, *A.* pays his own debt; it is money paid to the *use* of *B.*, not to *him*. But it is otherwise, where *A.* advances necessaries to any one, on account of *B.* who is bound by law to procure them; for instance, to the *wife* of *B.* There, in contemplation of law, the necessaries are advanced to *B.*

The other ground of objection to our action is equally untenable. Before that objection can prevail, it must be shown, not only that this case is within the statute, but that the statute furnishes the only remedy. But we contend, first, that the statute does not relate to *infant*

children; at any rate, it *creates* the duty only to *adult* June, 1808.
children; as to infants, it is only in aid of the common STANTON
law. It certainly does *create* the duty as to *them*; for v.
the obligation to support infant children is a common WILLSON.
law duty, enforced by action of common law. 1 *Bl.*
*Comm.* 446. 448, 449. 1 *Swift's Syst.* 204. *T. Raym.* 500.
In *Simpson* v. *Robertson*, 1 *Esp. Rep.* 17. *Ford* v. *Fo-*
*thergill*, 1 *Esp. Rep.* 211. and *Stone* v. *Carr*, 3 *Esp.* 1.
the action was at common law; but the *English* statute
of 43 *Eliz. c.* 2. is substantially like ours.

Secondly, the statute extends to those cases only, in
which application for *future* support is made by *select-*
*men*, or some stranger *related* to the pauper; not where
*the guardian has furnished* support. See *sect.* 2.

IV. Another ground, on which a new trial in this case
is moved for, is, that the plaintiff was admitted as a
witness.

It is not claimed, that she was incompetent, by reason
of *interest;* for the statute expressly admits those who
have the greatest interest.(*a*) But the ground relied
upon is, that to admit a wife to testify in a case in which
her husband is interested is opposed to sound policy, as
it would disturb family peace. We admit, that the wife
can neither be compelled, nor allowed to testify *against*
her husband. But in this case, let it be observed, that
the plaintiff had no husband when she testified; and that
her testimony was not against the interest of him whom
she represented, but in favour of it.

*By the Court.* SMITH and BALDWIN, Judges, dissenting,
SWIFT, J. absent. Parents are bound by law to maintain,
protect, and educate their legitimate children, during
their infancy, or nonage. This duty rests on the father;

(*a*) *Stat. Conn.* tit. 25. c. 1.

and it is reasonable it should be so, as the personal estate of the wife, and in her possession at the time of the marriage, becomes the property of the husband, and instantly vests in him.

By the divorce, the relation of husband and wife was destroyed; but not the relation between *Bird* and his children. His duty and liability, as to them, remained the same, except so far forth as he was incapacitated, or discharged, by the terms of the decree. This decree takes from him the guardianship of two of his children; and with it the right, which, as natural guardian, he might otherwise have exercised; and releases him from those duties only which a guardian, as such, is bound to perform. This transfer of the guardianship to the plaintiff vested her with powers similar to those of guardians, in other cases; and the appointment of the plaintiff to this trust did not subject her to the maintenance of the children, her wards, any more than a stranger would have been subjected by a like appointment. By accepting the trust, she became bound to provide for, protect, and educate them, at the expense of *Bird*, unless the decree of the general assembly has made other adequate provision, which, by the terms of that decree, she is bound to apply. This is not the case here. The sum allowed was directed to be paid to her *as her part and portion of Bird's estate, and in lieu of all claims of dower.*

Articles furnished by a guardian for the necessary support, maintenance and education of his ward, or by others at his request, are proper articles to be charged on book. *Book debt* is the proper action; and the party is, by statute, in this action, made a competent witness.

What articles are to be considered as *necessaries* must depend, in some measure, on the circumstances of the

party for whom they are furnished. (The court can only instruct the jury as to the *classes of articles*, which, by law, are considered as necessaries; but the *quantity* extent to which they have been furnished is a fact to be left to the jury;) and to what amount they shall be allowed must depend on their discretion.

It may be generally true, that minors under the government of parents cannot bind their parents for necessaries without their consent. The danger of encouraging children in idleness and disobedience, and of their being inveigled into expense by the artful and designing, furnishes a sufficient reason for the rule; but neither the rule, nor the reasoning, will apply to the charges in respect to two of the children in this case. The articles were furnished by the guardian herself, or at her request; who, in virtue of her trust, had full power to contract, and make the father liable for necessaries, not only *without* but *against* his consent.

With respect to the charges on account of *Herman's* support, if it is admitted, that "he eloped from his father for fear of personal violence and abuse, and could not with safety live with him," every reason for the rule that can be given, ceased to operate. Protection and obedience are relative duties; and when the wisdom that should guide the infant is lost in delirium, and the arm that should protect, and the hand that should feed him, is lifted for his destruction; obedience is no longer a duty, and the child cannot with any propriety be said to be under the government of a father. But because the father has abandoned his duty and trust, by putting the child out of his protection, he cannot thereby exonerate himself from its maintenance, education and support. The duty remains, and the law will enforce its performance, or there must be a failure of justice. The infant cast on the world must seek protection and safety

June, 1808.

STANTON
v.
WILLSON

where it can be found; and where, with more propriety can it apply, than to the next friend, nearest relative, and who are most interested in its safety and happiness? The father having forced his child abroad to seek a sustenance under such circumstances, sends a credit along with him, and shall not be permitted to say, it was furnished without his consent, or against his will.