[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Paternity was adjudicated in 1997 in this court for Tyrisse Rae'Kwon Ward, born July 13, 1996, the child of the parties hereto and the subject of the pending motions (hereinafter "Tyrisse"). The plaintiff mother has moved to open the paternity judgment. The State of Connecticut and the attorney for the minor child have filed motions for support. There have been numerous motion and evidential hearings over a period of two years in addition to proceedings before the Probate Court.
This action commenced in March 1997 when the State of Connecticut initiated a paternity petition pursuant to General Statutes § 46b-162. The petition and accompanying verified statement alleged that the named plaintiff, Tahare Drakeford was Tyrisse's mother and the named defendant, Joseph Ward (hereinafter "Joseph") as her father[1]. The petition was served in hand on Joseph at the Hartford Correctional Center on April 7, 1997.
On the assigned trial date, both Tahare Drakeford and Joseph were present before the court and filed pro se appearances. However, apparently Ms. Drakeford left before the hearing actually commenced. Transcript (hereinafter "T") 5/27/97, 1. The State then introduced a photocopy of an affirmation of paternity signed under oath by Ms. Drakeford several months earlier naming Joseph Ward as the father of Tyrisse. The court,Sosnoff, F.S.M., thoroughly canvassed Joseph who thereafter admitted paternity. The court then adjudged Joseph to be the father of Tyrisse. Joseph was then incarcerated apparently pending trial and for that reason the court "left open" the issue of support. T, 5/27/97, 3-6.
Problems arose regarding the care of Tyrisse resulting in the intervention of the Department of Children and Families. The child was removed from the home where he had resided with Ms. Drakeford and her mother. He was placed at various times in the residence of Ms. Drakeford's father, her aunt, and Joseph's parents. Eventually, on October 9, 1998, the Probate Court in Manchester appointed Joseph's parents, Annie Ward (hereinafter "Annie") and Joseph Ward, Sr. (hereinafter, "Joseph, Sr.") as guardians of Tyrisse. On August 3, 2000 on motion of Tyrisse's attorney, Annie and Joseph, Sr. were impleaded into the present case and have subsequently remained active participants herein.
On August 3, 1999 Tahare Drakeford filed a pro se motion to open the paternity judgment (#126.00). The stated the following basis: "Paternity CT Page 15867 was taken at Probate Court and the court will not give my son back to me until (sic) the files here at this court are changed." This motion was apparently never served because the Correction Department had moved Joseph to a facility in Cheshire while the sheriff had attempted service in Suffield. Ms. Drakeford refiled her motion to open (#127.00) this time effecting in hand service upon Joseph on September 15, 1999. In this motion, Ms. Drakeford states her reasons for opening the judgment as follows: "I'm reopening to change the paternity of my son. Joseph Ward was excluded from paternity DNA testing at the Probate Court. But the files here at this court has him as the father."
Although she failed to serve the Attorney General, the attorney for Tyrisse, and Annie and Joseph, Sr. the parties agreed to waive service and proceed on the merits. Ms. Drakeford has been represented by appearing counsel since October 2000. Joseph, Annie, and Joseph, Sr. continue to represent themselves pro se. All the other parties Joseph, the guardian ad litem for Tyrisse, Annie, Joseph, Sr. and the State of Connecticut all oppose opening of the paternity judgment.
 I FACTS
Tahare Drakeford was fifteen years old when she became pregnant with Tyrisse. She was engaged in an ongoing sexual relationship with Joseph Ward who was then twenty-three. She does not recall signing the sworn affirmation of paternity that was submitted at the original trial, but does not deny that the signature is hers.
Ms. Drakeford claims that from the outset she told Joseph that he was not Tyrisse's father. She claims that the real biological father is a Jason Lewis, who at the time was a classmate at Weaver High School. Yet she admits that she never told Jason Lewis that he was the father of her child. She dropped out of high school in February 1996 and thereafter has had no contact with Mr. Lewis. T, 2/1/2001, 9-11.
Ms. Drakeford does not recall signing the affirmation of paternity, but admits that it bears her signature. T, 2/1/2001, 15-16. As to the paternity trial, she claims that the court took luncheon recess before her case was reached. When she returned for the afternoon session, a sheriff outside the courtroom told her that "court was over with" and "Joseph Ward, Jr. established paternity." T, 2/1/2001, 16-17, 24-28. She did not make any attempt to open the paternity judgment until 1999.
Ms. Drakeford's contacts with the Department of Children and Families predate Tyrisse's birth and dates back to her own childhood, to 1993. In CT Page 15868 July 1997, Tyrisse was removed from his mother's home on a 96-hour hold. Subsequently, Tyrisse lived with Ms. Drakeford's father and with her aunt. Ms. Drakeford was not in the same home. In March 1998 Tyrisse was removed a second time. T, 2/1/2001, 65-69. Thereafter, the Department recommended that the child's paternal grandparents, Annie and Joseph, Sr. be made guardians. The caseworker, Clyde Mitchell, stated that the conduct of Ms. Drakeford herself caused influenced his recommendation: "[E]very time that it seemed DCF was getting — was gathering information against the mother to try to take her to court, she would go take the child to the Wards." T, 2/1/2001, 72. In Mitchell's view, the Wards provided Tyrisse a "more stable environment" than did the maternal grandfather or great aunt.
Indeed, Annie Ward's testimony conflicts somewhat with that of Ms. Drakeford. According to her, Tyrisse "has lived with me most of his life." T, 3/29/2001, 40. She claims that from birth there had been an agreement between Ms. Drakeford and her that they would share parenting of Tyrisse until Joseph was released from prison. She says Tyrisse lived mostly with her without a formal court order until October 1996, when "Tahare called the cops on me to take [Tyrisse] away." T, 3/29/2001, 37. She states that Tyrisse was with her most weekdays. On weekends, Ms. Drakeford would have the child, but that shortly either Ms. Drakeford's mother would call to have Annie pick up Tyrisse or Ms. Drakeford would drop him back at the Ward home. In August 1997, Tyrisse and his mother lived with her father in Manchester. This arrangement broke down in less than a month when the senior Drakeford "kicked her out". However, Tyrisse remained with the maternal grandfather and was cared for by him and Tahare's Aunt Michelle.
Ultimately, the Manchester Probate Court agreed with Mitchell's recommendation and issued a decree removing both Drakeford and Joseph as guardians and placing that responsibility on Annie and Joseph, Sr. In response to Ms. Drakeford's claims that Joseph was not the biological father Judge Cooney also ordered DNA tests of Joseph and Tyrisse. The test results became available in March 1999 and indicate that Joseph is not the biological father of Tyrisse.
The child has resided with the senior Wards since the decree was issued in October 1998. There was infrequent visitation by Ms. Drakeford and somewhat more regular visitation with the maternal grandfather and great aunt.
At the present time Tahare Drakeford is employed through temporary agencies. She presently earns $10.00 per hour and also takes classes. At the time of the last hearing she had not seen Tyrisse for several months. CT Page 15869
 II JURISDICTION
There is no specific statute relating to opening of an adjudicated paternity judgment. McNealy v. Dancy, 13 S.M.D. 113, 122,1999 Ct. Sup. 12793
(1999). A movant must rely on provisions for opening any civil judgment, General Statutes § 52-212a and Practice Book § 17-4. "These provisions allow a four month window from the date of judgment within which such a motion may be brought." In re Jonathan M.,255 Conn. 208, 237, 764 A.2d 739 (2001).
Earlier cases held that courts lacked subject matter jurisdiction to open a judgment unless the motion was filed within four months. VanMecklenberg v. Pan American World Airways, Inc., 196 Conn. 517, 5118,494 A.2d 549 (1985); Celanese Fiber v. Pic Yarns, Inc., 184 Conn. 461,465, 440 A.2d 159 (1981); Misinonile v. Misinonile, 190 Conn. 132, 134,459 A.2d 518 (1983); Handy v. Minwax Co., Inc., 46 Conn. App. 54, 56,698 A.2d 339 (1997); Ziruk v. Bedard, 45 Conn. App. 137, 139, 695 A.2d 4
(1997); Connecticut National Bank v. Oxenhandler, 30 Conn. App. 541,546-47, 621 A.2d 300, cert. denied, 225 Conn. 924, 625 A.2d 822 (1993). More recent law characterizes the statutory bar as "a limitation on the trial court's general authority to grant relief from a judgment. . . ."Yeong Gil Kim v. Magnotta, 249 Conn. 94, 103, 733 A.2d 809 (1999).
Ms. Drakeford filed her motion to open over two years after the date of the original judgment. This is well beyond the time bar in the statute. Therefore the court does not have the authority to grant the motion absent proof by the moving party of an extraordinary factor such as fraud, mistake, or duress.
Even if the plaintiff successfully proves that at least one of the above factors apply, she must overcome countervailing factors such as laches, estoppel and unclean hands. "[Olne of the essential conditions for granting of such a motion is that the evidence which the party seeks to offer could not have been known and with reasonable diligence produced at trial." Stocking v. Ives, 156 Conn. 70, 73, 238 A.2d 421 (1968);Fedele v. Romero, 37 Conn. Sup. 885, 888, 441 A.2d 867 (1982).
 III FINALITY OF JUDGMENT
It is well established that our courts favor finality in judicial decisions. Meinket v. Levinson, 193 Conn. 110, 113, 414 A.2d 454 (1984); CT Page 15870Vogel v. Vogel, 178 Conn. 358, 362, 422 A.2d 271 (1979); Perkins v.Perkins, 3 Conn. App. 322, 328, 487 A.2d 1117 (1985); Joseph v. Lilburn,
14 S.M.D. 351, 353 (2000); Tirado v. Rivera, 13 S.M.D. 212, 221,1999 Ct. Sup. 15638
(1999); Yade v. Nagy, 4 S.M.D. 237 (1990); State of Floridav. Backlund, 2 S.M.D. 61, 71 (1988). "Public policy requires that a term be put to litigation and the judgments, as solemn records upon which valuable rights rest, should not lightly be disturbed or overthrown. . . ." Lampson Lumber Co. v. Hoer, 139 Conn. 294,297, 93 A.2d 143 (1952); White v. Cordier, 14 S.M.D. 98, 102, 27 Conn. L. Rptr. 365, 2000 Ct. Sup. 6486 (2000); Pullen v. Cox,
9 S.M.D. 134, 137 (1995).
"The finality of judgment in family matters is crucial to our community's stability." Berry v. Berry, Superior Court, judicial district of Hartford/New Britain at Hartford, doc. no. FA91-0391459,1993 Ct. Sup. 22
(Steinberg, J. January 5, 1993); Joseph v. Lilburn, supra, 14 S.M.D. 353. "The need for finality of judgment . . . must apply as much or more to cases where a young child for whom the passage of time which may seem short for an adult or teenager, can be almost an eternity to an infant, and work changes with substantial and irreversible effect." In re Kelly S., Superior Court, juvenile matters, judicial district of Windham at Willimantic, doc. no. N90-159, 1991 Ct. Sup. 10450, 10464 (Teller, J. Dec. 5, 1991); In re Nathan and Michael G., Superior Court, juvenile matters, judicial district of Windham at Willimantic, 1993 Ct. Sup. 9953, 9967 (Brenneman, J. Nov. 17, 1993); In re Mark and Amy C., Superior Court, juvenile matters, judicial district of New London at Montville,1991 Ct. Sup. 7960, 10464 (R. Walsh, J. Sept. 24, 1991); In re JesusLugo, Superior Court, juvenile matters, judicial district of Hartford/New Britain at Plainville, 1990 Ct. Sup. 878, 887 (Brenneman, J. Aug. 24, 1990).
The importance of the principle of finality of judgment is amplified when the parties had hill opportunity originally to contest the issues.Meinket v. Levinson, 193 Conn. 110, 114, ___ A.2d ___ (1984);Monroe v. Monroe, 177 Conn. 173, 178, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S.Ct. 20, 62 L.Ed.2d 14 (1979);Mauriello v. Mauriello, 1992 Ct. Sup. 4774, Superior Court, judicial district of Waterbury, doc. no. 84337 (May 29, 1992,Harrigan, J.).
In family matters as in criminal cases, the principal of finality of judgment must be balanced against other interests, such as assuring that no party will be deprived of constitutional rights, or achieving a factually accurate as well as a fair result. Asherman v. State,202 Conn. 429, 521 A.2d 578 (1987). Although not the sole decisive factor, in the present case the court can not find that the plaintiff has CT Page 15871 proven factors so compelling as to overcome finality of judgment.
 IV FRAUD
Notwithstanding the inclination for finality, a judgment obtained by fraud may be attacked even after the time limitation for opening the judgment. Kenworthy v. Kenworthy, 180 Conn. 129, 131, 429 A.2d 837
(1980); Gatling v. Gatling, Superior Court, judicial district of Waterbury, doc. no. 52272, 1990 Ct. Sup. 801 (Aug. 9, 1990, Harrigan,J.); White v. Cordier, supra, 14 S.M.D. 103; McNealy v. Dancy, 13 S.M.D. 113, 119, 1999 Ct. Sup. 12793 (1999).
In order to establish fraud, the moving party must prove: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." Miller v. Appleby, 183 Conn. 51, 54-55,438 A.2d 811 (1981); Paiva v. Vanech Heights Construction Co.,159 Conn. 512, 515, 271 A.2d 69 (1970); Barnes v. Starr; 64 Conn. 136,1250, 28 A. 980 (1894); Gatling, supra; Tirado v. Rivera, 13 S.M.D. 212, 221, 1999 Ct. Sup. 15638 (1999); Pullen v. Cox, supra, 9 S.M.D. 138.
Additionally, the judgment may be opened only if the moving party is not barred by any of the following restrictions: "(1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must have been diligence in the original action, that is, diligence in trying to discover and expose the fraud. (3) There must be clear proof of the perjury or fraud. (4) There must be a substantial likelihood that the result of the new trial will be different. James, Civil Procedure (1965) § 11.7, pp. 540-42; 36 Ill.L.Rev. 894, 896-97 (1942). Furthermore, the granting of such relief must not unfairly jeopardize interests of reliance that have taken shape on the basis of the judgment. James Hazard, Civil Procedure (2d Ed.) § 13.14, p. 687." Varley v. Varley, 180 Conn. 1, 4, 428 A.2d 317
(1980); Tirado v. Rivera, 13 S.M.D. 212, 221, 1999 Ct. Sup. 15638 (1999);McNealy v. Dancy, supra, 13 S.M.D. 120; Pullen v. Cox, supra, 138.
The moving party bears a heavy burden of proof. "Fraud must be proven by `clear and satisfactory evidence', a standard more exacting than a fair preponderance of the evidence." Gatling, supra; see also Alaimo v.Royer; 188 Conn. 36, 39, 448 A.2d 207 (1982). The standard is also phrased "clear, precise and unequivocal evidence." Connell v. Colwell,214 Conn. 242, 571 A.2d 116 (1990); Alaimo, supra, 39; Lopinto v.Haines, 185 Conn. 527, 534, 441 A.2d 151 (1981); DeLuca v. C.W. BlakesleeCT Page 15872 Sons, Inc., 174 Conn. 535, 546, 391 A.2d 170 (1978); T.O. RichardsonCo. v. Brockbank, Superior Court, judicial district of Hartford/New Britain at Hartford, doc. no. 703826 (March 23, 1995, Sheldon, J.);Pullen v. Cox, 9 S.M.D. 134, 138 (1995).
Although not clearly articulated in the plaintiff's motion, it is apparent from her brief that she relies on a claim of fraud. There are two distinct aspects of fraud suggested by her claims. First, the plaintiff herself asserted Joseph's parentage of Tyrisse by executing under oath an affirmation naming him as the father. The State, the guardian and the paternal grandparents all argue that the plaintiff can not rely on her own fraud as grounds to open the judgment. The court agrees. Lyman v. Lyman,90 Conn. 399, 409, 97 A. 312 (1916) (marriage procured by the fraud of a woman in representing to the man that she was pregnant by him, when, at the time of such representation, she knew she was pregnant by another).
The plaintiff claims initially no recollection of signing the affirmation document. She does not deny that the document indeed bears her signature. She asserts that she was not advised of the legal import of the document. This assertion is hardly credible, however, in view of her claim that she did not remember signing the document at all. The plaintiff has the burden of proof on this motion. It is not sufficient to simply assert the absence of proof that she was advised. Furthermore, the import of the document is plain on its face. There is no credible evidence that the plaintiff, whether she had been advised or not, misunderstood the implications of naming Joseph as the father on a legal document.
Furthermore, the plaintiff had ample opportunity to correct the "fraud". The obvious time to do so was at the paternity trial. Ms. Drakeford attended court that day with her mother, but was not present when the hearing was actually conducted. The court can not find her explanation credible. She posits that the court took its usual lunch recess, and that immediately on conclusion of the usual lunch period, she returned to court and was told court was over. It makes no sense that the court would recess for lunch and never resume its session, even if only to formally adjourn. At the very least, the plaintiff has the burden of proof, and it is not met by her uncorroborated self-serving testimony. Although the court has a transcript of the hearing, which shows nothing irregular other than the absence of the plaintiff, neither a transcript or other record has been introduced to illuminate when and why the court adjourned. The sheriff who allegedly told her court had adjourned was not called as a witness. In fact, one could conclude from Joseph's testimony that the hearing was held before lunch. Transcript, 2/1/2001, 55.
The second aspect of fraud claimed by the plaintiff in her brief is CT Page 15873 that Joseph "made a false representation when he signed the affirmation of paternity and at trial on May 27% 1997 when he unequivocally stated that he was the father of the minor child." The affirmation introduced at the 1997 trial was signed by Drakeford, not by Joseph. As to his "unequivocal statement" that he was the child's father, he did respond "yes" to the question "Are you the father of this child." Most of Joseph's testimony at that trial consisted of one word monosyllabic answers to leading questions.
In view of the introduction of the affirmation signed under oath by Ms. Drakeford, it is hard to fathom how the one word answer affirming paternity can be considered fraud. Joseph claims he didn't know he was not Tyrisse's biological father at the time. Ms. Drakeford claims he knew from the outset, but had agreed to give the child his last name.
Drakeford and Joseph had engaged in sexual intercourse before, during and after the possible time of conception. Joseph admits he was aware that Drakeford's relationship with him was not exclusive, but didn't press to determine whether he was the child's biological father. The law doesn't require him to do so. If it did, there would be no acknowledgment procedure or paternity adjudication allowed without an affirmative DNA test. Without such a test no man can "know" whether or not he is a child's father.
Joseph knew there was a possibility that he was Tyrisse's father and that Drakeford had named him on a sworn document. He knew they had discussed the matter and agreed that he would accept the responsibility. He has not wavered from this responsibility, even after the later DNA results became known. Under such circumstances, the court can not find that his simple answer "yes" constituted a false representation, known by him to be untrue. Even if it was, two other elements of fraud are lacking. It can not be argued that Joseph made his statement to induce the other party — Drakeford — to act on it. After all, it was she who signed the sworn affirmation. She was also in a position to avert the paternity determination, or at least put the court on notice, simply by recanting her affirmation in court.
 V MISTAKE
Additional grounds exist whereby a court may open a judgment after the expiration of four months. "The court does have jurisdiction to open a stipulated judgment, on a motion, even after the four month period has elapsed if the movant can show that the judgment was obtained by fraud, duress, accident or mistake." Yeong Gil Kim v. Magnotta, 49 Conn. App. 203, CT Page 15874 209, 714 A.2d 38, reversed on other grounds 249 Conn. 94, 733 A.2d 809
(1998); Solomon v. Keiser; 22 Conn. App. 424, 577 A.2d 1103 (1990);McDonnell v. McDonnell Superior Court, judicial district of Hartford, doc. No. FA94-0535761 (February 2, 1999, Bishop, J.).
There is no claim of duress or accident. The plaintiff does claim material mistake of fact as grounds to open the judgment. "Mistake is not readily susceptible of general definition. To the extent that a comprehensive definition of the term can be fashioned, it has been said that it signifies an erroneous mental conception which influences a person to act or to omit to act." Guaranty Bank Trust Co. v. Dowling,4 Conn. App. 376, 379-80, 494 A.2d 1216, cert. denied, 197 Conn. 808,499 A.2d 58 (1985).
In her brief, the plaintiff relies on language in General Statutes § 46b-172 (a)(2). This argument is of limited applicability to the present case because the judgment was the result of an adjudication, not an acknowledgment. The paternity acknowledgment statute precludes review of a filed acknowledgment after sixty days or upon entry of a support order. The section provides that after this period of time the acknowledgment "may be challenged in court or before a Family Support Magistrate . . . only on the basis of fraud, duress or material mistake of fact which may include evidence that he is not the father. . . ." General Statutes § 46b-172 (a)(2); Veilleux v. Burski, 14 S.M.D. 309, 311 (2000). The statute includes "evidence that he is not the father" as a "material mistake of fact". There is no requirement of "mutual mistake". The material mistake can be mutual or unilateral.
Mutual mistake has been held to exist where both parties are mutually mistaken about the same material fact. Buol Machine Co. v. Buckens,146 Conn. 639, 641, 153 A.2d 826 (1959); Dainty Rubbish service, Inc. v.Beacon Hill Association, Inc., 32 Conn. App. 530, 537, 630 A.2d 115
(1993); see also Harlach v. Metropolitan Property Liability Ins. Co.,221 Conn. 185, 190, 602 A.2d 1007 (1992). Yet in other instances, courts have held that although a party moving to open a judgment must "demonstrate that there is a good and compelling reason for the court to grant the motion . . ." the applicable statutes and practice rules ". . . [do] not contain a precise list of what the moving party must show in order to prevail. . . ." First Union National v. TDB International,22 Conn. L. Rptr. 252 (1998).
An acknowledgment of paternity is akin to a stipulated judgment. Some courts have recognized a slightly differing standard in opening a judgment entered by consent compared to those resulting from adjudication. Gillis v. Gillis, 214 Conn. 336, 572 A.2d 323 (1990). In the case of stipulated judgments, contract principles pertinent to CT Page 15875 reformation are sometimes invoked. Reformation may be applicable due to mutual mistake or a unilateral mistake coupled with fraud or inequitable conduct. Rodie v. National Surety Corporation, 143 Conn. 66, 69,118 A.2d 908 (1955); Shawmut Bank Connecticut v. Connecticut LimousineService, Inc., 40 Conn. App. 268, 273, 670 A.2d 880 (1996); City IronWorks, Inc. v. Frank Badsteubner Post No. 2090, 22 Conn. Sup. 230,167 A.2d 462 (1960).
The provisions for reopening an acknowledged paternity are pertinent only to the extent that they illuminate to what extent mistake justifies opening a judgment. In this regard it has been held that "the statute does not create a bright line standard but merely allows the court to consider evidence of nonpaternity among other factors." Martinez v. Collins, 15 S.M.D. 1, 11 (2001); see also White v. Cordier; 14 S.M.D. 98, 106,27 Conn. L. Rptr. 365,2000 Ct. Sup. 6486 (2000); McNealy v. Dancy, 13 S.M.D. 113, 122, 1999 Ct. Sup. 12793 (1999). A motion to open "is not to be granted readily, nor without strong reasons, it may and ought to be when there appears cause for which the court, acting reasonably would feel . . . bound in duty to do so." McCulloch v. Pittsburgh Plate Glass Co.,107 Conn. 164, 167, 140 A. 114 (1927); Wildman v. Wildman, 72 Conn. 262,270, 44 A. 224 (1899).
In the only other know Connecticut case where a mother sought to reopen a judgment on the issue of paternity of her child, the mother claimed mistake. The court denied the motion because the husband never questioned paternity and denied that there was any mistake. Mauriello v. Mauriello,1992 Ct. Sup. 4774, Superior Court, judicial district of Waterbury, doc. no. 84337 (May 29, 1992, Harrigan, J.).
The present plaintiff argues that both she and Joseph knew that he was not the child's biological father. If this is true it is hard to ascribe the results as a mutual mistake because both parties at the time intended the result. If Joseph is correct that he only knew later that he was not the biological father, there is a basis to find unilateral mistake. However; the primary injured party, Joseph, does not claim mistake and opposes opening the judgment. The most likely scenario is that Joseph, knowing that Drakeford had intercourse with him and with another man, realized it was possible he was the father and possible he was not. He had discussed with Drakeford taking on the responsibility of being the child's father. He knowing acceded to this, and knowingly waived his right to challenge it. He was under no "erroneous conception" which influenced his actions. Hence there was no unilateral mistake on his side.
Nor does the child's representative claim mistake. An analysis of the child's interest will be undertaken later in this memorandum. As to the CT Page 15876 issue of mistake, this factor is essentially a contracts concept and would seem not to pertain to a party not privy to the transaction. Annie and Joseph, Sr. do not claim mistake. Although not party to the original transaction — the paternity judgment they have certainly relied on the outcome. However, far from claiming injury, they have made it clear that they regard Tyrisse as their grandchild regardless of the biology. In fact all of the parties other than Drakeford oppose the motion.
As to Ms. Drakeford, she was the one person privy to all of the salient facts. She can not be heard to claim that she always knew Joseph was the not father, then swear under oath that he is the father, then walk away from an opportunity to recant at the trial, and then complain of the result. "The complainant ought not to be the transgressor himself, and then complain that by chance he has been injured on account of his own misconduct . . . the equity court will not lend him its jurisdiction to right a wrong of which he himself is the author." 1 Story, Equity Jurisprudence (14th Ed.) 98, Boretz v. Segar, 124 Conn. 320, 323,199 A. 548 (1938).
 VI LACHES
In Mauriello, in addition to rejecting the claim of mistake, the court held that the mother "could have litigated the paternity of the minor child before entry of the final judgment. Her assault upon the judgment is too late." Similarly, in the present case even if Ms. Drakeford had proyen fraud or mistake she would be barred from opening the judgment because of her lack of diligence.
She claims she always knew Joseph was not Tyrisse's biological father. She certainly knew their sexual relations were not exclusive. She has had no hesitation in asserting this where to do so furthers her goals — in a meeting with the Department of Children and Families to spite the Wards — in the Probate Court to further her claim of custody of Tyrisse — and to pursue this motion. Yet she allowed herself to sign under oath a statement affirming Joseph as the father. Her claims that she did not understand the import of the document are simply not credible. Even were it true that no explanation of the legal ramifications were offered, at not withstanding her tender age at the time, the document is so plain on its face as to render her claim implausible.
Of greater concern, however, is her failure to correct the situation when given the perfect opportunity to do so at trial. Again, her explanation of how it was that she presented herself to the court on the right day and place but somehow was inadvertently absent during the CT Page 15877 actual hearing begs credulity. If the events happened as she claims, any reasonable person would be in the clerk's office within minutes to file a motion to open the judgment. It took Ms. Drakeford over two years. She "had ample opportunity to raise the paternity issue . . . within the statutory time, and incidentally at a time less prejudicial to the State and [the child]." Pullen v. Cox, 9 S.M.D. 134, 144 (1995); Angelus v.Angelus, 20 Conn. LRptr. 252 (1997); Perkins v. Perkins, 3 Conn. App. 322,487 A.2d 1117 (1985).
"Laches consists of an inexcusable delay which prejudices the defendant." Bozzi v. Bozzi, 177 Conn. 232, 239, 413 A.2d 834 (1979);Kurzatkowski v. Kurzatkowski, 142 Conn. 680, 685, 116 A.2d 906 (1955);Brock v. Cavanaugh, 1 Conn. App. 138, 140, 468 A.2d 1242 (1984); Lowndsv. Lownds, 41 Conn. Sup. 100, 551 A.2d 775 (1988); Lynk v. Lynk, 11 S.M.D. 233, 235; Thomas v. Ah Tau Ah Nee, 8 S.M.D. 135, 139 (1994);Samatowitz v. Samatowitz, 4 S.M.D. 30 (1990).
"Laches consists of two elements. First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant. . . . The mere lapse of time does not constitute laches . . . unless it results in prejudice to the defendant . . . as where, for example, the defendant is led to change his position with respect to the matter in question." (Citations omitted; internal quotation marks omitted.) Papcun v. Papcun, 181 Conn. 618, 620-21, 436 A.2d 282 (1980).
The delay in this case has prejudiced Joseph Ward. Although he has been incarcerated for the entire life of this child, he has endeavored to lay the groundwork to father the child, just as he agreed with Drakeford. He speaks to Tyrisse on the phone several times a week. He has made the emotional commitment to be a father to Tyrisse even absent a biological connection. Unquestionably, had the motion to open been filed and granted back in 1997 he would not have invested himself of this commitment for the past four years.
The delay even more acutely prejudices Annie Ward and Joseph Ward, Sr. They have provided their home for Tyrisse. They have committed time to the processes of the Department of Children and Families and the Probate Court. They have not done so to provide a baby-sitting service to Ms. Drakeford. They have done so because Tyrisse is their grandson, a position unshaken by the disclosure of the DNA results.
Tyrisse himself is prejudiced by the delay. The court will separately analyze the child's independent interest. Suffice it to say here that Tyrisse has invested most of his life in bonding with Annie and Joseph, Sr. as his grandparents, Joseph as his father, and in making a place for himself in the only stable home he has had. CT Page 15878
Ms. Drakeford did not exercise reasonable diligence in pursuing a timely determination of the biological facts. Her delay was not excusable and did prejudice the interests of the child, his father and the grandparents. Castonguay v. Plourde, 46 Conn. App. 251, 265, 699 A.2d 226, cert. denied 243 Conn. 931, 701 A.2d 660 (1997);Joseph v. Lilburn, 14 S.M.D. 351, 363 (2000). Accordingly she is barred from opening the paternity judgment by laches.
 VII ESTOPPEL
"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse. . . . Its two essential elements are that one party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts to act on that belief, and that the other party, influenced thereby, must change his position or do some act to his injury which he otherwise would not have done." (Citations omitted; internal quotation marks omitted.) Bozzi v. Bozzi, 177 Conn. 232, 241-42,413 A.2d 834 (1979).
"Estoppel rests on the misleading conduct of one party to the prejudice of the other." W. v. W., 248 Conn. 487, 496, 728 A.2d 1076 (1999);Remkiewicz v. Remkiewicz, 180 Conn. 114, 119, 429 A.2d 833 (1980). The misleading conduct of Ms. Drakeford has already been chronicled. It may not be demonstrable that Joseph or the State have changed their position for the worse as a result thereof. Any detriment that Joseph has incurred is offset by the benefits he accrues from his status as a parent.Clevenger v. Clevenger, 189 Cal.App.2d 658, 671, 11 Cal.Rptr. 707
(1961). Furthermore, because of his incarceration, Joseph has not provided any financial support, and hence has not yet incurred any financial detriment.
However, it is clear that Annie and Joseph, Sr. have detrimentally changed their position. In providing a home for Tyrisse they have undertaken a substantial financial commitment as well as a significant emotional investment. While our courts have cautioned "that equitably estopping parents from denying parenthood is an extraordinary measure because it involves a judicially created imposition of the parental status . . ." W. v. W., supra, 248 Conn. 503-04, the court finds that the conduct of Drakeford and the detrimental reliance of Annie and Joseph, CT Page 15879 Sr., as well as Tyrisse himself, warrant its application here.
 VIII CLEAN HANDS
"It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with `clean hands'. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court." Eldridge v. Eldridge, 244 Conn. 523, 536,710 A.2d 757 (1998); Pappas v. Pappas, 164 Conn. 242, 246, 320 A.2d 809
(1973); McCarthy v. McCarthy, 55 Conn. App. 326, 335, 752 A.2d 1093
(1999).
"Where a plaintiff's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief, and will leave him to whatever remedies and defenses at law he may have." Thompson v. Orcutt, 257 Conn. 301,310, ___ A.2d ___ (2001); Samasko v. Davis, 135 Conn. 377, 383, 64 A.2d 682
(1949).
The Family Support Magistrate Division is a statutory court and is limited to act within the statutory powers granted to it. Reynolds v.Allicock, 15 S.M.D. ___, 2001 Ct. Sup. 2456 (2001); Dalley v. Wineglass,
11 S.M.D. 1, 26 (1997); Holden v. Skinner, 7 S.M.D. 19, 24 (1993).Jorgensen v. Jorgensen, 1 S.M.D. 34 (1987); see also Conn. Constitution, Article Fifth; Article XX of Amendments; Article XXV of Amendments; General Statutes § 46b-231 (m); Brown v. O'Connell, 36 Conn. 432
(1870); Betts v. Town of New Hartford, 25 Conn. 180 (1856); Osborn v.Stamford Zoning Board of Appeals, 11 Conn. Sup. 489 (1943). Normally a statutory court does not have equity jurisdiction. However, family matters inherently have equitable aspects. Furthermore, a motion to open judgment, like a petition for a new trial, while governed by statute, is essentially equitable in nature. State v. Grimes, 154 Conn. 314, 325,228 A.2d 141 (1966); Wendt v. Wendt, 2001 Ct. Sup. 3413, 3415, Superior Court, judicial district of Stamford/Norwalk at Stamford, doc. no. FA99-0172598 (Shay, J., March 1, 2001). See also Jacobs v. Fazzano,59 Conn. App. 716, 757 A.2d 1215 (2000).
The clean hands doctrine is applied from time to time in family cases.Hooker v. Hooker, 130 Conn. 41, 51, 32 A.2d 68 (1943). For example in a dissolution of marriage actin, Miller v. Miller, 22 Conn. App. 310, 315,577 A.2d 297 (1990) the court applied unclean hands to bar defendant's objection to paying plaintiff a lump sum from part of real estate fraudulently conveyed to his brother. CT Page 15880
In Sachs v. Sachs, 22 Conn. App. 410, 416, 578 A.2d 649, cert. denied,216 Conn. 815, 580 A.2d 60 (1999) the court barred the plaintiff on grounds of unclean hands from challenging court's jurisdiction based on his own allegations of residency, stating "we cannot now allow the plaintiff to profit from his own misrepresentations." Id. "One who seeks to prove that he is entitled to the benefit of equity must first come before the court with clean hands." Cohen v. Cohen, 182 Conn. 193, 201,438 A.2d 55 (1980); Polverari v. Peatt, 29 Conn. App. 191, 614 A.2d 484
(1992).
Ms. Drakeford has demonstrated a tendency to manipulate the facts as suits her desires of the moment. By signing an affidavit she knew to be untrue, her hands became unclean. Her failure to correct her statement at trial exacerbated this. The court does not view the present motion as an effort to finally redress her error. The language of the motion itself betrays her true motive, which is to gain advantage in her efforts to seek custody of her son. She is barred from the relief she requests in this matter by reason of her unclean hands.
 IX CHILD'S INDEPENDENT INTEREST
Connecticut has long recognized that children have a separate and independent interest in family relations matters. In re Bruce R.,234 Conn. 209-210; Nye v. Marcus, 198 Conn. 138, 502 A.2d 869 (1985);Guille v. Guille, 196 Conn. 260, 492 A.2d 175 (1985); Salvio v. Salvio,186 Conn. 311, 441 A.2d 190 (1982); Yontef v. Yontef, 185 Conn. 275,440 A.2d 899 (1981). Our Supreme Court has held that minor children even may appeal an order regarding their own support in the absence of a guardian ad litem, if the trial court finds that it is in their best interests to do so. Newman v. Newman, 235 Conn. 82, 663 A.2d 980 (1995). "It can no longer be disputed that the minor child. has a separate and distinct interest in the outcome of this motion." Pullen v. Cox, 9 S.M.D. 134, 145 (1995).
The court acknowledges several cases that prioritize the right of the child to a determination of the biological father. Johnson v. Domina,
Superior Court, Judicial District of Hartford, doc. No. FA88-0340848,1998 Ct. Sup. 11005 (Dranginis, J., Sep. 24, 1998); Lillibridge v.Lillibridge, Superior Court, Judicial District of Hartford, doc. No. FA89-0356816 (Dranginis, J., October 21, 1998)[2]; Andrew-White v.Mitchell, 15 Conn. L. Rptr. 629, 1995 Ct. Sup. 12280 (McWeeney, J., Nov. 13, 1995); McNealy v. Dancy, 13 S.M.D. 113, 119, 1999 Ct. Sup. 12793
(1999); Cardona v. Negron, 13 S.M.D. 138, 147, 1999 Ct. Sup. 10847 (1999) CT Page 15881
"This court is not persuaded that the interest of a minor child in determining his parentage categorically trumps traditional concern for finality of judgment." White v. Cordier, 14 S.M.D. supra, 110. These are issues the court must weigh and consider in determining the motion presently before the court.
In the present case the court is persuaded that notwithstanding efforts to undercut the relationship, Tyrisse does have a father-son relationship with Joseph. Although limited by his present confinement, Joseph has made it a point to talk to Tyrisse on the telephone often, in contrast to the erratic and increasingly rare visitation afforded by Ms. Drakeford. There is also clearly bonding with three of the grandparents, Annie, Joseph, Sr., and Mr. Drakeford, although the later is not in a position to assume custody for any prolonged period. It is the Wards that have afforded Tyrisse a stable and loving environment in which he has begun to flourish. T, 3/29/2001, 43-44.
The court affords substantial weight to the opinion of the child's guardian ad litem. Here, the guardian argues that Tyrisse is a victim of Ms. Drakeford's conduct. She argues that the plaintiff led Joseph, the Department of Social Services, the Department of Children and Families, Anne, Joseph, Sr., the Probate Court and Tyrisse himself, to believe that Joseph was the child's father. She argues that Drakeford "should be estopped from changing that direction by stripping Tyrisse of the only father he has ever known and the security he has in living with the paternal grandparents."
It is far from clear that seeking out the true biological father in the present case is an exercise that will redound to the best interests of Tyrisse. First, there is no reason to consider Ms. Drakeford's present nomination any more credible than the original one turned out. Secondly, there is sparse evidence upon which to base a search and Ms. Drakeford herself has made no sustained effort to contact the man, whose present whereabouts are unknown. W. v. W., supra, 248 Conn. 505. Neither the child's guardian nor the court are convinced that the child's best interest dictate removal of the only father he has known, and his paternal grandparents who have provided him his only stable home, to disrupt the life of another man who may or may not be the child's biological father and may or may not have any interest in playing the part if he is.
While Joseph is far from the ideal father, he at least tries. The guardian is clearly convinced that the child's best interests dictate denial of the motion and allowing the paternity judgment to stand. This court concurs and concludes that opening the judgment would not be CT Page 15882 consistent with the best interests of this child.
 X THE INTEREST OF THE STATE OF CONNECTICUT
"The State's financial interest is not the determining factor but one of many the court must analyze." Joseph v. Lilburn, 14 S.M.D. ___ (2000). In many paternity cases the State has a significant financial interest represented by either ongoing public assistance or recoupment of past public assistance. Even if no temporary family assistance has been paid, the State has an interest in a final paternity determination to secure proper financial support for the child with an eye to averting the necessity for future State assistance. See White v. Cordier, 14 S.M.D ___27 Conn. L. Rptr. 365 (2000); McNealy v. Dancy, 13 S.M.D. 113, 115,1999 Ct. Sup. 12793, 12795 (sub nom. Tiffany M. v. Walter D.) (1999).
In the present case, however, the State's financial interest is minimal. Tyrisse has not received any public assistance and the Ward grandparents have sufficient financial stability and commitment to the child that future public assistance is unlikely. The court does recognize that even absent a direct fiscal interest, Connecticut "evinces a strong state policy of ensuring that minor children receive the support to which they are entitled." In re Bruce R., 234 Conn. 194, 209, 662 A.2d 107
(1995).
After careful consideration of the facts of this case and weighing all of the foregoing factors and considerations the court finds that the plaintiff has failed to prove fraud or mistake. The best interests of the child are inconsistent with opening of the paternity judgment. Furthermore, even if Drakeford had proven sufficient facts to overcome the presumption of finality of judgment, she is barred by her own actions and lack of diligence on the basis of laches, estoppel and unclean hands. Accordingly, her motion to open the paternity judgment is denied.
 XI OBLIGATION TO SUPPORT
This court recognizes and takes judicial notice of the action of the Manchester Probate Court in designating the impleaded co-plaintiffs, Annie Ward and Joseph Ward, Sr., as guardians of Tyrisse effective October 9, 1998. For purposes of determining support the court will treat them as co-custodians of the child on and subsequent to that date, and treat both Joseph and Ms. Drakeford as non-custodial parents from that date forward. No court order regarding custody or guardianship has been CT Page 15883 produced for any period prior to that date. Accordingly, the court will treat the named plaintiff, Tahare Drakeford as the custodial parent from Tyrisse's birth until the effective date of the Probate Court guardianship decree.
The original paternity petition requested, inter alia, that the court "order [Joseph] to be liable for the financial and medical support and maintenance of [Tyrisse] . . . and payment of support to the State for disbursement to the child's custodian and the State as their interests may appear." At the original trial on May 27, 1997, the State requested no arrearage and asked that current support be "left open". The court,Sosnoff, F.S.M., found zero arrearage as of May 27, 1997, costs of $25.90, and ordered Joseph to seek employment when released from incarceration. T, 5/27/97, 5-6.
The State of Connecticut filed a motion for support on May 21, 2001 requesting a current support order, past due support dating back to May 27, 1997, medical coverage, and such other orders as the court deems appropriate. The attorney for the minor child had previously, on January 2, 2001, filed a motion for support seeking a support order against Ms. Drakeford. It was agreed by all parties that if the court denied the motion to open the paternity judgment it would immediately address the issues of support raised by the two motions.
Ms. Drakeford, by her counsel, does not dispute the claim for a support order against her, but argues that a support order must also enter against Joseph. "[I]t is the obligation of the now putative father and the mother of the child to pay child support. . . . We would respectfully argue . . . that you must find that [Joseph] is just as obligated to supporting the child as the mother of the child is." T, 7/19/2001, 24.
The defendant, Joseph Ward, did not articulate a position on the matter of support at the July 19 hearing. In earlier hearings, he acceded to at least his theoretical obligation to provide monetary support to Tyrisse, although he may well view this obligation as attaching only once he is released from incarceration. T, 3/29/2001, 14.
Annie Ward does not seek child support from either Ms. Drakeford or from Joseph. She believes that she and her husband, Joseph, Sr., have historically provided for Tyrisse and will continue to do so. T, 7/19/2001, 23; T, 3/29/2001, 36.
The attorney for the child claims a support order should enter against Ms. Drakeford. As to support from Joseph, she views Annie and Joseph, Sr. as "standing in his place, so to speak" as custodians of the child. CT Page 15884 "[T]hey are not seeking any support from him because it is their position that they are supporting their grandson for the benefit of their son until he's released from incarceration. . . . I don't have an issue with Mr. Ward not paying child support while he's incarcerated." T, 7/19/2001, 9.
The State, after pointing out that the grandparents were not seeking child support from their son, is not actively pursuing support. Although it questioned Ms. Drakeford briefly as to her financial affidavit and pointed out some fallacies in her affidavit and the submitted guidelines worksheet, it did not strenuously pursue support as to her, either, apparently electing to allow the parties to argue the issue[3].
It has long been the law of this state that "a guardian is not bound to support his ward out of his own estate. . . ." Favrow v. Vargas (II),231 Conn. 1, 18, 647 A.2d 731 (1994); Penfield v. Savage, 2 Conn. 386,387 (1818); see also Finch v. Finch, 22 Conn. 411, 420 (1853); Stantonv. Willson, 3 Day 37, 56 (1808); R. Folsom G. Wilhelm, Connecticut Estates Practice (2d Ed. 1991) § 3:10. Neither a parent nor a guardian can by contract relieve a non-custodial parent of a support obligation, absent court approval. Guille v. Guille, 196 Conn. 260, 266,492 A.2d 175 (1985); Favrow (II) supra, 231 Conn. 22, McNeil v. McNeil, 5 S.M.D. 133, 135 (1991).
"[T]his court has the statutory authority `to make and enforce orders for support against any person who neglects or refuses to furnish necessary support to . . . a child under the age of eighteen. . . .' General Statutes § 46b-215 (a)(1). The statute does not preclude any party from requesting the support order. In fact, the court could sua sponte order support under this section provided that proper notice is provided the subject person or persons. . . . It is implicit in the computation of current support orders that each parent's share must be computed, regardless of who requests the support order. Clearly, if either parent's support obligation is not met by providing direct support to a child in that parent's custody or by satisfactory and appropriate voluntary payments, it is not only the court's right, but its duty, to set a support order." DeCamillis v. Hasiotis, 15 S.M.D. ___, 7 Conn. Ops. 1152 (headnote only) (2001).
"There is nothing in [the statute's] language or in the important public policy that it reflects, to suggest that the obligation of a parent to support [his or her] child, according to [his or her] ability, is subject to a condition precedent of a formal demand. That obligation is ongoing, and does not require the trigger of a request by those persons who are shouldering that responsibility." Favrow v. Vargas (I),222 Conn. 699, 717, 610 A.2d 1267 (1992); Mulholland v. Mulholland,
CT Page 1588531 Conn. App. 214, 233, 624 A.2d 379 (1993).
The court recognizes that the Ward grandparents do not wish a support order to enter against their son Joseph. In fact, they even eschew a support order against Ms. Drakeford. The court also recognizes that it is unlikely that they will recoup more than a fraction of the financial obligation they have already expended on behalf of Tyrisse and will undoubtedly continue to incur. The court holds, however, consistent with the public policy principals stated, that it should exercise its discretion to enter appropriate support orders against both parents. The court agrees with Tyrisse's attorney and guardian ad litem that Ms. Drakeford must pay both current support and arrears commensurate with her ability to pay. And the court agrees with Ms. Drakeford's attorney as a matter of propriety, impartiality and fairness that Joseph is just as obligated to support the child as is Ms. Drakeford.
 XII DETERMINATION OF SUPPORT
Both parents have submitted financial affidavits from which the attorney for the child has submitted a guidelines worksheet. As the State pointed out, there are some minor fallacies in these documents, primarily an unexplained unusually large reduction in Ms. Drakeford's income from gross to net, and the improper inclusion of the Ward grandparents' income in the computation.
The court finds that Ms. Drakeford currently works for a temporary agency. When she works, she is usually paid $10 per hour. She lists her average weekly gross on her financial affidavit as $400.00 per week. This representation is credible and the court finds it to be her gross income. She lists her net as $290 per week, but tax tables suggest that her actual net should be about $317.00. The court finds her net to be $317.00 per week. The court finds the presumptive order under the child support guidelines to be $76.00 per week[4]. The court finds no reason to deviate and orders Ms. Drakeford to pay $76.00 per week effective December 1, 2001.
With regard to arrearages, Ms. Drakeford acquired her present temporary job in December, 2000. T, 2/1/2001, 46. Previously, she had been registered with several temporary employment agencies and had substantial employment dating back about two years. She was paid between $8.50 and $10.00 per hour and usually worked a 40-hour week. Prior to that she was in school at Fox Institute of Business. T, 2/1/2001, 47-48. There is no credible evidence that she provided any monetary support to Annie or Joseph, Sr. on a voluntary basis. The court finds the arrearage owed by CT Page 15886 Ms. Drakeford to the Ward grandparents to be $11,232.00 as of November 30, 2001[5]. She is ordered to pay $9.00 per week on the arrearage making a total weekly payable order of $85.00 per week. Immediate income withholding is ordered. Ms. Drakeford is required to make payments as directed by the State and is responsible for the full payment each week notwithstanding the effectiveness of the withholding order. The Department of Social Services is directed to provide' written Payment instructions forthwith as well as advisement of rights regarding income withholding.
Joseph Ward remains incarcerated in the state corrections system. He reports no income.
Connecticut law is clear that that a court may consider a party's earning capacity rather than actual income in computing a support order. Utilization of earning capacity is warranted by a self-imposed reduction in income combined with a failure by the obligor to utilize his earning capacity. Johnson v. Johnson, 185 Conn. 573, 576, 441 A.2d 578 (1981);Miller v. Miller; 181 Conn. 610, 611-12, 436 A.2d 279 (1980); Siracusav. Siracusa, 30 Conn. App. 560, 566, 621 A.2d 309 (1993); Carey v.Carey, 29 Conn. App. 436, 440, 615 A.2d 516 (1992); Richard v. Richard,23 Conn. App. 58, 63, 579 A.2d 110 (1990); Hart v. Hart, 19 Conn. App. 91,94, 561 A.2d 151 (1989); Hollings v. Milde, 38 Conn. Sup. 500, 452 A.2d 314
(1982); Bonadio v. Bonadio, Superior Court, judicial district of Danbury, doc. no. FA99-0337168 (Pickard, J., March 14, 2001); Fredo v.August, 13 S.M.D. 83, 87, 1999 Ct. Sup. 7998 (1999); Moffit v. Moffit, 12 S.M.D. 41, 42, 1998 Ct. Sup. 6530 (1998); Danford v. Symonds, 12 S.M.D. 32, 36 (1998); Murray v. Stone, 11 S.M.D. 149, 152 (1997), Brown v.Brown, 11 S.M.D. 140, 147 (1997); Englemann v. Englemann, 10 S.M.D. 90, 147 (1997); Henja v. Brown, 10 S.M.D. 42, 147 (1996); Kimery v. Kimery, 9 S.M.D. 54, 57 (1995); Jodoin v. Jodoin, 9 S.M.D. 7, 8 (1995) Hay v. Hay, 8 S.M.D. 51, 54 (1994); Campbell v. Scott, 7 S.M.D. 8, 12, 8 C.S.C.R. 507, 11 Conn. Fam.L.J. 71 (1993); Bardsley v. Bardsley, 6 S.M.D. 112, 116 (1992);Ouellette v. Ouellette, 6 S.M.D. 83, 85 (1992). The child support guidelines provide for deviation where the court finds "[o]ther financial resources available to a parent." A parent's earning capacity is specifically included in this subsection. Regs., Conn. State Agencies § 46b-215a-3-(b)(1)(B).
It may be argued that where an obligor's employment is interrupted by incarceration following conviction of criminal activity, his earning capacity remains intact, having been impeded by his own volitional act in committing the crime resulting in the incarceration. There is a lively debate among courts nationally accepting or rejecting this argument.
Recently, this court has explored this issue comprehensively reviewing CT Page 15887 Connecticut and sister state law. The court concluded that "the recent trend in this State . . . holds the defendant liable to pay support based on earning capacity notwithstanding incarceration." Shipman v. Roberts,
15 S.M.D. ___, 30 Conn. L. Rptr. 47, 2001 Conn. Sup. 7471 (2001). Other recent Connecticut case law supports this view. Sorey v. Smith, 15 S.M.D., 7 Conn. Ops. 1079 (digest) (2001); Forman v. Forman, 29 Conn.L.Rev. 394, 2001 Ct. Sup. 3663 (Robaina, J., March 13, 2001); Mortonv. Morton, Superior Court, judicial district of Tolland at Rockville, Docket No. 67544 (Zarella, J., April 7, 1999); Crouse v. Crouse,21 Conn. L. Rptr. 390, 1998 Ct. Sup. 1642 (Solomon, J., 1998); Charette v.Charette, 19 Conn. L. Rptr. 187, 3 Conn. Ops. 579, 1997 Ct. Sup. 3609
(Zarella, J., 1997), Deal v. Deal; Superior Court, Judicial District of Middlesex at Middletown, doc. no. 73317, 1996 Ct. Sup. 327 (Gordon, J.,
Jan. 2, 1996); O'Connell v. O'Connell, 7 Conn. L. Rptr. 447, 7 C.S.C.R. 1175
(Axelrod, J., May 14, 1992); Sorey v. Smith, 15 S.M.D. ___, 7 Conn. Ops. 1079 (headnote only) 2001; Shepaum v. Hernandez, 14 S.M.D. 374 (Bentivegna, F.S.M., Nov. 20, 2000); Suarez v. Carmona, 14 S.M.D. 414 (Bentivegna, F.S.M., Nov. 28, 2000); McBride v. Singleton, 13 S.M.D. 267, 2000 Ct. Sup. 693 (Lifshitz, F.S.M., Dec. 25, 1999); Graham v.Graham, 12 S.M.D. 172 (Nov. 19, 1998, Sosnoff, F.S.M.), Carrero v.Gonzalez, 11 S.M.D. 177 (Lifshitz, F.S.M., August 3, 1997); Scapin v.Scapin, 11 S.M.D. 171, 20 Conn. L. Rptr. 348, 3 Conn. Ops. 1039,1997 Ct. Sup. 9530 (Lifshitz, F.S.M, 1997); Moore v. Moore, 10 S.M.D. 197 (Trombley, F.S.M., Oct. 3, 1996); Fleming v. Raiford, 10 S.M.D. 80 (Sullivan, F.S.M., June 20, 1996); Collier v. Jennings, 1 S.M.D. 92,3 C.S.C.R. 204 (Lifshitz, F.S.M., Dec. 30, 1987)[6].
Joseph Ward has been incarcerated for the entire life of Tyrisse due to conviction on criminal charges. He is due for release in 2005. Consistent with the foregoing case, the court grants the State's motion for support and finds Joseph liable for a current support order and past due support based on his earning capacity.
Prior to his arrest, Joseph's highest paying job was with Barrieau Moving and Storage earning between $10 and $12 per hour[7]. Based on an earning capacity deviation as well the best interests of the child, and with reference to the statutory factors, the court finds that $90.00 is a fair and equitable amount to charge as Joseph's support obligation, both current and past. He is ordered to pay $90.00 per week current support.
With regard to arrearages, the initial trial court found zero arrearage and $25.90 in costs as of May 27, 1997. From that date until the Manchester Probate Court's guardianship decree on October 9, 1998, he owes past due support to Ms. Drakeford. The court finds an arrearage owing from Joseph to Ms. Drakeford in the amount of $6,390.00 as of November 30, 2001[8]. Subsequently, he owes back support to his CT Page 15888 parents. That arrearage totals $14,670.00 as of November 30, 2001[9]. He continues to owe the State $25.90 costs. The court orders him to pay $9.00 per week on the arrearages, divided equally between Ms. Drakeford and his parents (i.e. $4.50 to Ms. Drakeford and $4.50 jointly to the Ward grandparents). Thus his total weekly payment is $99.00 per week. If he is unable to pay while incarcerated, the arrearage will continue to accrue to be paid through the periodic order upon his release. The accruing arrearage shall not be deemed delinquent. Immediate income withholding is ordered. He is required to make payments as directed by the State and is responsible for the full payment each week notwithstanding the effectiveness of the withholding order. The Department of Social Services is directed to provide written payment instructions forthwith as well as advisement of rights regarding income withholding. The seek-work order entered by Family Support Magistrate Sosnoff remains in effect immediately upon his release from institutional custody.
The court directs that each parent pay the full amount of his or her support order without offset of any sums due from the other parent. This is necessary for clarity in monitoring compliance and tracking arrearages.
Medical insurance orders were entered by Magistrate Sosnoff in 1997. The court extends the obligation to provide medical insurance to both parents. The original order did not include an allocation of unreimbursed medical costs. This court declines to further address that issue absent a motion to modify. The court also declines to address day care reimbursement at this time.
In summary, the motion to open the paternity judgment is denied. Support orders and arrearages are entered as set forth above as to both parents[10].
BY THE COURT
Harris T. Lifshitz Family Support Magistrate